**UNITED STATES DISTRICT COURT FOR**
**THE NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | |
|---|---|
| STEVEN SMITH (a pseudonym), individually and on behalf of all others similarly situated,<br><br>Plaintiff,<br><br>v.<br><br>SURGICAL CARE AFFILIATES, LLC, SCAI HOLDINGS, LLC, UNITED HEALTHGROUP, INC., and JOHN DOES 1-10,<br><br>Defendants. | Civil Action No. __________<br><br>**CLASS ACTION COMPLAINT**<br><br>**JURY TRIAL DEMANDED** |

Plaintiff Steven Smith ("Plaintiff"), by way of complaint against defendants Surgical Care Affiliates, LLC, SCAI Holdings, LLC, UnitedHealth Group, Inc. (collectively "SCA") and John Does 1-10, alleges as follows:

**INTRODUCTION**

1. This action addresses a conspiracy among the nation's leading operators of outpatient medical care facilities to restrain competition and reduce compensation for their senior-level employees. Plaintiff is a former senior-level employee of SCA and brings this suit individually and on behalf of the Proposed Class to recover damages and to prevent Defendants from retaining the benefits of their antitrust violations.

2. Defendants Surgical Care Affiliates, LLC, SCAI Holdings, LLC, UnitedHealth Group, Inc. and John Does 1-10 (collectively "Defendants") ostensibly compete with one another to hire and retain employees throughout the United States. However, beginning no later than 2010, Defendants entered into agreements to avoid competing for senior-level employees, by refraining from soliciting or hiring each other's senior-level employees absent the knowledge

and consent of their existing employers. These "no-poach" agreements continued through at least 2017, and Defendants' most senior executives monitored and enforced these agreements.

3. These no-poach agreements were not necessary to any legitimate business transaction or lawful collaboration among the companies. Defendants' conspiracy was strictly a tool to suppress their senior-level employees' compensation, and hence their own expenses.

4. These no-poach agreements accomplished their purpose. They reduced competition for Defendants' senior-level employees and suppressed Defendants' senior-level employee compensation below competitive levels. The conspiracy disrupted the efficient allocation of labor that would have resulted if Defendants had competed for, rather than colluded against, their current and prospective senior-level employees.

5. Defendants' agreements also denied their senior-level employees access to job opportunities, restricted their mobility, and deprived them of significant information that they could have used to negotiate for better compensation and terms of employment.

6. The conspiracy was initially revealed publicly on January 7, 2021, when the United States Department of Justice ("DOJ") issued a press release announcing a criminal indictment against SCA, which detailed the conspiracy. That indictment references two co-conspirator companies, "Company A" and "Company B," who are identified only as owners and operators of "outpatient medical care facilities across the United States." *See* Indictment, *United States v. Surgical Care Affiliates, LLC*, No. 3:21cr00011 (N.D. Tex.) (filed Jan. 5, 2021).

**JURISDICTION AND VENUE**

7. This action arises under section 1 of the Sherman Act (15 U.S.C. §§ 1) and section 4 of the Clayton Act (15 U.S.C. § 15(a)) and seeks the recovery of treble damages, costs of suit, and reasonable attorneys' fees for the injuries that Plaintiff and members of the Class

(defined below) sustained as a result of Defendants' anticompetitive conduct. The Court has subject matter jurisdiction pursuant to 28 U.S.C. §§ 1331, 1337(a), 1407, and 15 U.S.C. § 15.

8. Venue is proper in this District pursuant to 15 U.S.C. §§ 15(a), 22 and 28 U.S.C. §§ 1391(b), (c), and (d) because during the Class Period, Defendants resided, transacted business, were found, or had agents in this District, and a substantial portion of Defendants' activity that affected the interstate trade and commerce discussed below has been carried out in this District.

9. During the Class Period, Defendants assessed, hired, and retained senior-level employees in a continuous and uninterrupted flow of interstate commerce, including in this District. Defendants' conduct had direct, substantial, and reasonably foreseeable effects on interstate commerce in the United States, including in this District.

10. This Court has *in personam* jurisdiction over Defendants because they, either directly or through the ownership and/or control of their subsidiaries, *inter alia*: (a) transacted business throughout the United States, including in this District; (b) participated in the assessment, hiring and retention of senior-level employees throughout the United States, including in this District; (c) had and maintained substantial aggregate contacts with the United States as a whole, including in this District; or (d) were engaged in an illegal conspiracy that was directed at, and had a direct, substantial, reasonably foreseeable, and intended effect of causing injury to the business or property of persons and entities residing in, located in, or doing business throughout the United States, including in this District. Defendants also conduct business throughout the United States, including in this District, and have purposefully availed themselves of the laws of the United States.

11. By reason of the unlawful activities alleged herein, Defendants substantially affected commerce throughout the United States, causing injury to Plaintiff and members of the Class. Defendants, directly and through their agents, engaged in activities to limit competition and fix, raise, maintain, and/or stabilize the compensation and terms of employment of their senior-level employees in the United States, which unreasonably restrained trade and adversely affected the market for the services of senior-level employees in the outpatient medical care industry.

12. Defendants' unlawful conduct described herein adversely affected persons and entities in the United States who served as senior-level employees for Defendants, including Plaintiff and the members of the Class.

**PARTIES**

13. Steven Smith (a pseudonym) was employed by Defendant Surgical Care Affiliates, LLC during the proposed Class Period.

14. Defendant Surgical Care Affiliates, LLC was a company organized and existing under the laws of Delaware with its principal places of business in Birmingham, Alabama and Deerfield, Illinois. Defendant SCAI Holdings, LLC is the successor entity to Surgical Care Affiliates, LLC.

15. Defendant SCAI Holdings, LLC is a company organized and existing under the laws of Delaware, and is the successor entity to defendant Surgical Care Affiliates, Inc. SCAI Holdings, LLC is a wholly-owned subsidiary of defendant UnitedHealth Group, Inc.

16. Defendant UnitedHealth Group, Inc. is a company organized and existing under the laws of Delaware, with its principal place of business in Minnetonka, Minnesota.

17. John Does 1-10 are persons and entities that conspired with SCA as described herein. They include, at a minimum, "Company A" and "Company B," as described in the above-referenced criminal indictment. The identity of the John Doe Defendants cannot be known without discovery from SCA. Plaintiff will request leave to amend this complaint upon learning the identity of the John Doe Defendants during appropriate discovery.

## FACTUAL ALLEGATIONS

### Defendants' No-Poach Conspiracy

18. SCA, Company A, and Company B were competitors in the recruitment and retention of senior-level employees across the United States. Over a period spanning at least the years 2010 through 2017, SCA, Company A, and Company B entered into no-poach agreements to eliminate competition among themselves for senior-level employees. These agreements were executed and enforced by the companies' most senior executives. The no-poach agreements were not reasonably necessary to any separate, legitimate business transaction or collaboration among the companies.

19. Defendants participated in meetings, conversations, and communications to discuss the solicitation of each other's senior-level employees, and agreed during those meetings, conversations, and communications not to solicit each other's senior-level employees. For example, on or about May 14, 2010, the CEO of Company A emailed other employees of Company A that "I had a conversation w [the CEO of SCA] re people and we reached agreement that we would not approach each other's proactively."

20. On or about October 20, 2014, the CEO of Company B emailed the CEO of SCA the following: "Someone called me to suggest they reach out to your senior biz dev guy for our corresponding spot. I explained I do not do proactive recruiting into your ranks."

21. Defendants told certain executives, employees, and recruiters to avoid soliciting senior-level employees of each other's companies. For example, on or about November 11, 2013, a senior human resources employee at Company A told a recruiter the following: "Please do not schedule a call w/ [candidate], thanks. She would have had to apply for the job first. We cannot reach out to SCA folks. Take any SCA folks off the list." On or about December 12, 2015, SCA's human resources executive instructed a recruiter to "note that [Company A] and [Company B] are off limits to SCA."

22. Defendants told each other's senior-level employees who were candidates for employment at the other companies that they were required to notify their current employer to that effect. For example, on or about November 1, 2013, employees of Company A discussed whether to interview a candidate employed by SCA in light of the "verbal agreement with SCA to not poach their folks . . . ." The CEO of Company A disclosed that "[w]e do have that agreement and want to stick by it. If [candidate] indeed did approach us, and is willing to tell [the CEO of SCA] that I'm ok." The senior human resources officer at Company A responded: "Yikes, she is not going to want to do that. But I will check."

23. On or about April 26, 2016, SCA's human resources executive emailed a candidate from Company B that she could not recruit from Company B, with the exception of "candidates [who] have been given explicit permission by their employers that they can be considered for employment with us."

24. On or about October 16, 2015, SCA's CEO emailed an SCA human resources executive: "Putting two companies in italics ([Company A] and [Company B]) - we can recruit junior people (below Director), but our agreement is that we would only speak with senior executives if they have told their boss already that they want to leave and are looking."

25. Defendants alerted their co-conspirators when each other's senior-level employees were recruited, and policed violations of the conspiracy. For example, on or about December 8, 2015, the CEO of Company A informed the CEO of SCA: "Just wanted to let you know that [recruiting company] is reaching out to a couple of our execs. I'm sure they are not aware of our understanding." The CEO of SCA told other SCA executives: "We should continue to flag [Company A] on our 'do not call' list to recruiters - is OK if we get an inbound inquiry and the leader has communicated within [Company A] that they want to leave, but outbound calls should not be occurring."

26. On or about June 13, 2016, an employee of SCA forwarded news of a recruitment, noting that: "I thought there was a gentlemen's agreement between us and [Company B] re: poaching talent." An SCA officer replied: "There is. Do you mind if I share with [SCA's CEO], who has most recently addressed this with [Company B's CEO]." SCA's CEO relayed the news to Company B's CEO, who replied "Will check it out."

27. Defendants refrained from soliciting each other's senior-level employees. For example, on or about July 17, 2017, a human resources employee of Company A, believing a candidate to be employed by SCA, emailed a recruiting coordinator for Company A that, although the candidate "look[ed] great" she "can't poach her."

28. On or about April 7, 2017, SCA's CEO was contacted by a consultant regarding his interest in a candidate employed by Company B, and responded: "In order to pursue [candidate], he would need to have already communicated that he is planning to leave [Company B] — that's the relationship that we have with [Company B]." The consultant responded, ". . . I'm glad you arrived at that agreement with [Company B's CEO]."

**Effects of No-Poach Agreements**

29. Labor markets are far from perfectly competitive. They do not function like commodity markets where market-wide demand and supply determines a single market price. Instead, market participants determine prices through interacting with each other. This is particularly true for jobs in which specialized experience or skills are value, such as senior-level employees in outpatient medical care facilities. Market frictions result when, as here: (1) workers are not fully informed about all alternatives available to them; (2) it is costly for workers to move between employers; and (3) workers do not have a large choice of essentially identical positions. Such market frictions adversely impact competition in labor markets.

30. These market frictions are well-recognized in labor economics. For instance, the 2010 Nobel Prize in Economics was awarded to Peter A. Diamond, Dale T. Mortensen, and Christopher A. Pissarides, "for their analysis of markets with search frictions."[1] Almost all of their research (what is known as the search and matching framework) was about the analysis of frictions caused by limited information in labor markets.

31. "Price discovery" refers to the process by which a market searches for prices when information about supply and demand is imperfect. Class members worked in an environment characterized by such imperfect information, and thus the price discovery framework is appropriate here. The speed at which price discovery operates depends on the manner in which, and how rapidly, information is disseminated among employers and employees.

---

[1] *See, e.g.*, *The Sveriges Riksbank Prize in Economic Sciences in Memory of Alfred Nobel 2010*, THE NOBEL PRIZE, nobelprize.org/prizes/economic-sciences/2010/summary/ (last visited January 25, 2021).

32. Along with market frictions, the specialized field of senior management in the outpatient medical care industry is subject to high supply-demand pressures. There is high demand for and limited supply of senior-level employees in the outpatient medical care facilities. Employees within the industry, like those working for the Defendants, are key sources of potential talent to fill these openings. Solicitation of this small pool of talent within the medical management labor market is essential in overcoming both market frictions and the innate supply-demand pressures.

33. Soliciting employees from other outpatient medical care industry employers is a particularly efficient and effective method of competing for qualified senior employees. Soliciting involves communicating directly—by phone, email, social and electronic networking, or in person—with competitors' employees who have not applied for a job opening. Such direct solicitation can be done by the soliciting firm's personnel or by outside recruiters. Firms in the outpatient medical care industry rely on direct solicitation of employees of other outpatient medical care companies because those individuals have specialized experience, and may be less likely to respond to other methods of recruiting.

34. In a competitive labor market, outpatient medical care industry employers would compete with one another to attract senior-level employees for their needs. It is this competition among employers for those employees that determines the level of compensation. While employers would like to pay low wages for high-quality senior-level employees, competition increases the available job opportunities and requires employers to make the best possible offers to prospective senior-level employees. It also improves senior-level employees' ability to negotiate for better salaries and other terms of employment. Soliciting and hiring senior-level employees from other outpatient medical care industry employers is attractive to companies like

SCA because these employees have training and experience that are lacking in hires from a different industry. Hiring employees from a different industry requires the company to invest significant resources in identifying, assessing, and training those employees. For these reasons and others, lateral hiring within the outpatient medical care industry is a key form of competition.

35. Competition for workers via lateral hiring has a significant impact on compensation in a number of ways. First, competition facilitates the flow of information about opportunities and compensation. For example, employees who are solicited, interviewed, or offered a job by a competitor gain insight into how other companies value their work and experience, and what compensation and benefits their competitors typically pay or are willing to pay them to leave their current employer. This information is not otherwise readily available to senior-level employees, who are generally able to rely only on these encounters and word-of-mouth from peers and colleagues for such information. Employers, on the other hand, often hire private consulting firms to gather information regarding market compensation rates. No-poach agreements further restrain employees' access to this information by eliminating or reducing the communications that encourage the flow of information.

36. Defendants no-poach restrictions precluded this information from reaching senior-level employees at Defendants' companies. Those employees would have used that information to negotiate higher pay at their existing jobs, or to accept superior offers from their employers' competitors. Indeed, empirical economic research confirms that employees who change jobs voluntarily typically have faster wage growth than those who remain in the same job. Senior-level employees could have also shared this information with their co-workers, multiplying the impact of each offer as the information would have spread through social channels.

37. Second, the threat of losing employees to competitors encourages employers to increase and maintain compensation to ensure high morale, productivity, and retention. Absent competitive compensation, employees are more likely to seek such compensation elsewhere, be receptive to recruiting by competitors, limit their productivity, and undermine morale. After employees receive offers from competitors, retaining those employees may require raising their compensation, and may pressure employers to raise the compensation of other employees. Employers therefore have an incentive to prevent lateral departures by paying employees competitive salaries. In competitive industries, preventive retention measures thus lead to increased compensation for employees. But in the outpatient medical care industry, Defendants' conspiracy substantially spared them from taking such measures, at the expense of their senior-level employees.

38. Defendants had an incentive to ensure that their employees felt that their compensation was fair, based on broad comparisons across job descriptions and titles. This principle, referred to as "internal equity," requires that pay differentials be perceived as based on objective criteria.

39. What constitutes "fair" is based on comparisons that employees draw between themselves and other employees at their company and in their field. For example, it is generally not considered fair for there to be pay differentials for workers doing the same work at the same level based solely on the fact that a few of these employees may have received an outside solicitation or offer of alternate employment. However, employees do not care only about how they are paid compared to employees doing the same work, but also how much they make in comparison to those they work with, even if the jobs are not similar.

40. Due to "internal equity" considerations, raising the pay of one employee in order to retain them leads to pay raises for not only those who perform similar work (and thus are within the same pay bands or grades), but for a wider swath of employees who base their notions of fair compensation on certain degrees of differentials between themselves and those other employees. Formalized pay systems with such an element of rigidity are a mechanism by which a raise or diminution in the pay of one group of employees is transmitted to other employees.

41. Defendants' conspiracy restrained competition for senior-level employees and disrupted the normal bargaining and price-setting mechanisms that apply in competitive labor markets. This disruption and suppression of compensation was not limited to particular individuals who would otherwise have been solicited or sought to change employers. The effects of eliminating solicitation and lateral hiring, pursuant to agreement, caused widespread impact on Defendants' senior-level employees by eliminating or reducing the flow of information and the need for preventive and reactive increases to compensation for the entire Class.

**Effects on Interstate Commerce**

42. During the relevant time period, Defendants employed members of the Class throughout the United States, including in this judicial district.

43. Defendants' conspiracy substantially reduced competition for labor in the outpatient medical care industry and suppressed the efficient movement and compensation of outpatient medical care industry employees, harming Plaintiff and members of the Class. The harm extended not only to those who did or would otherwise have sought to change companies, but also to those who had no intention of seeking other employment because the no-poach agreements enabled Defendants to maintain suppressed compensation levels generally.

44. Thus, Defendants' no-poach agreements and related conduct substantially affected interstate commerce for employee services and caused antitrust injury throughout the United States.

**Defendants Fraudulently Concealed Their Conspiracy**

45. During the Class Period (defined below), Defendants concealed their conspiracy, such that Plaintiff and Class members could not have discovered it through the exercise of reasonable diligence.

46. Until recently, Plaintiff and Class members did not discover and did not know of any facts that would have caused a reasonable person to suspect that Defendants were conspiring to restrain competition for the services of their senior-level employees.

47. For these reasons, all applicable statutes of limitation have been tolled based on the discovery rule, the doctrine of equitable tolling, and/or Defendants' fraudulent concealment. Defendants are thus estopped from relying on any statutes of limitations in defense of this action.

**CLASS ACTION ALLEGATIONS**

48. Plaintiff brings this action individually and on behalf all those similarly situated as a class action under Rules 23(a) and (b)(3) of the Federal Rules of Civil Procedure, seeking monetary damages on behalf of the following class (the "Class"):

> All natural persons who were employed by SCA in the United States as senior-level employees from January 1, 2010 through December 31, 2017. Excluded from the Class are SCA's officers, directors, and senior-level employees who participated in the conspiracy described in the Complaint.

49. Plaintiff believes there are hundreds, if not thousands, of members of the Class as described above, the exact number and their identities being known by SCA, making Class members so numerous and geographically dispersed that joinder of all members is impracticable.

50. The Class is precisely ascertainable from SCA's records.

51. Plaintiff's claims are typical of the claims of the Proposed Class and Subclasses as they arise out of the same course of Defendants' conduct and the same legal theories.

52. Plaintiff will fairly and adequately represent the interests of the Proposed Class and Subclasses and has no conflict with the interests of the Proposed Class or Subclasses.

53. There are numerous questions of law and fact common to each Class member, including, but not limited to:

a. whether Defendants and their co-conspirators agreed not to solicit or hire each other's senior-level employees;

b. whether such agreements were per se violations of the Sherman Act;

c. whether Defendants have fraudulently concealed their misconduct;

d. whether and the extent to which Defendants' conduct suppressed compensation below competitive levels for their senior-level employees;

e. whether Plaintiff and the Class suffered antitrust injury as a result of Defendants' agreements; and

f. the type and measure of damages suffered by Plaintiff and the Class.

54. During the Class Period, Plaintiff was employed by SCA at or above the Director level. Plaintiff's interests are coincident with and not antagonistic to those of the other members of the Class.

55. Plaintiff is a member of the Class, has claims that are typical of the claims of the Class members, and will fairly and adequately protect the interests of the members of the Class. In addition, Plaintiff is represented by counsel who are competent and experienced in the prosecution of antitrust and class action litigation.

56. The above-referenced common questions of law and fact predominate over any questions affecting only individual members of the Class.

57. A class action is superior to any other means of resolving this litigation. Separate actions by individual Class members would be inefficient and would create the risk of inconsistent or varying judgments. There will be no material difficulty in the management of this action as a class action.

**FIRST CLAIM FOR RELIEF**
**(Violation Of The Sherman Act, § 1)**

58. Plaintiff realleges and incorporates by reference each of the allegations contained in the preceding paragraphs as if fully set forth herein.

59. Defendants, by and through their officers, directors, employees, or other representatives, entered into and engaged in unlawful agreements in restraint of trade and commerce in violation of Section 1 of the Sherman Act, 15 U.S.C. § 1. Specifically, Defendants and their co-conspirators agreed to restrict competition for Class members' services through refraining from soliciting or hiring each other's senior-level employees, thereby fixing and suppressing Class members' compensation.

60. Defendants' agreements have included concerted action and undertakings with the purpose and effect of: (a) fixing Plaintiff and the Class's compensation at artificially low levels; and (b) eliminating, to a substantial degree, competition among Defendants and their co-conspirators for senior-level employees.

61. Defendants' combinations and conspiracy injured Plaintiff and the members of the Class by suppressing their compensation and depriving them of free and fair competition in the market for their services.

62. Defendants' conduct and agreements are per se violations of Section 1 of the Sherman Act.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff, individually and on behalf the proposed Class of similarly situated persons, respectfully requests the following:

a. That the Court certify this lawsuit as a class action under Rules 23(a) and (b)(3) of the Federal Rules of Civil Procedure, that Plaintiff be designated as class representative, and that Plaintiff's counsel be appointed as Class counsel for the Class;

b. The conduct alleged herein be declared, adjudged, and/or decreed to be per se unlawful under Section 1 of the Sherman Act, 15 U.S.C. § 1.

c. Plaintiff and the Class recover their damages, trebled, and the costs of the suit, including reasonable attorneys' fees as provided by law; and

d. For such other and further relief as the Court may deem just and proper.

## JURY DEMAND

Pursuant to Federal Rule of Civil Procedure 38, Plaintiff, individually and on behalf of the proposed Class, demands a trial by jury on all issues so triable.

Dated: February 3, 2021

Respectfully submitted,

*/s/ Stephanie A. Scharf*
Stephanie A. Scharf (N.D. Ill. No. 6191616)
Sarah Marmor (N.D. Ill. No. 6216487)
Scharf Banks Marmor LLC
333 West Wacker Drive, Suite 450
Chicago, IL 60606
312-726-6000
sscharf@scharfbanks.com
smarmor@scharfbanks.com

Roberta D. Liebenberg (*pro hac vice* forthcoming)
Gerard A. Dever (*pro hac vice* forthcoming)
Mary L. Russell (*pro hac vice* forthcoming)
FINE, KAPLAN AND BLACK, R.P.C.
One South Broad Street, 23rd Floor
Philadelphia, PA 19107
(215) 567-6565
rliebenberg@finekaplan.com
gdever@finekaplan.com
mrussell@finekaplan.com

Linda P. Nussbaum (*pro hac vice* forthcoming)
Bart D. Cohen (*pro hac vice* forthcoming)
NUSSBAUM LAW GROUP, P.C.
1211 Avenue of the Americas, 40th Floor
New York, NY 10036
(917) 438-9102
lnussbaum@nussbaumpc.com
bcohen@nussbaumpc.com

Gary M. Klinger
MASON LIETZ & KLINGER LLP
227 W. Monroe Street, Ste. 2100
Chicago, IL 60606
(202) 429-2290
gklinger@masonllp.com

Michael L. Roberts
Kelly Rinehart
Karen Halbert
William R. Olson
ROBERTS LAW FIRM US, PC
1920 McKinney Ave., Suite 700
Dallas, TX 75204
(501) 821-5575
mikeroberts@robertslawfirm.us
kellyrinehart@robertslawfirm.us
karenhalbert@robertslawfirm.us
williamolson@robertslawfirm.us

William E. Hoese
KOHN, SWIFT & GRAF, P.C.
1600 Market Street, Suite 2500
Philadelphia, PA 19103
(215) 238-1700
whoese@kohnswift.com

*Counsel for Plaintiff and the Proposed Class*